Upon review of all of the competent evidence of record with reference to the errors assigned, and finding good grounds to reconsider the evidence, the Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement dated November 13, 1996 and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On August 9, 1993, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On August 9, 1993, an employer-employee relationship existed between plaintiff and defendant-employer, and the employer was a qualified self-insured, with The Travelers acting as the administering agent.
3. On August 9, 1993, plaintiff sustained an accepted occupational disease to both hands and wrists.
4. On August 9, 1993, plaintiff's average weekly wage was $320.75.
5. As a result of her occupational disease, plaintiff sustained an eight percent permanent partial impairment to her right hand which defendant has agreed to compensate.
6. Plaintiff continues to work for defendant-employer as of November 13, 1996.
7. All N.C.I.C. Forms are stipulated into evidence, including Forms 18 (January 31, 1995), 19 (September 22, 1993), 26 (unsigned and undated), 28B (March 14, 1996), 33 (February 20, 1995), 33 (July 5, 1996), 33R (April 4, 1995), 33R (July 15, 1996) and 60 (November 3, 1995).
8. The issues before the Commission are whether plaintiff's continued medical problems are the result of her August 9, 1993 compensable occupational disease, and, if so, to what past and future benefits is plaintiff entitled?
 *********** RULING ON EVIDENTIARY MATTER
A set of medical records identified by a "Medical Records Index" was referred to as being attached to the Pre-Trial Agreement, but was not included in the record before the Full Commission. The Full Commission has now included these medical records as a part of the record.
 ***********
Based upon the competent evidence of record herein, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a fifty-four year old, right-handed female with a date of birth of February 24, 1942, and had completed the tenth grade.
2. In May, 1989 plaintiff began working for defendant-employer ("Revco Scientific" at the time) in a repetitive, hand intensive job where she cleaned large medical freezers. Plaintiff's job required her to "pull various manufactured units out of a dryer, clean them with cleaner, and also use a caulking gun fairly frequently."
3. While similarly engaged in the same work on August 9, 1993, plaintiff presented to orthopedic hand and upper extremity surgeon, Dr. Stephen Westly, with symptoms she described as aching and tingling of both wrists radiating into the fingers and up to the forearm. Dr. Westly found that plaintiff's symptoms and physical findings were consistent with low-grade median nerve irritation and/or compression at the right and possibly the left carpal canals. Dr. Westly determined that plaintiff's condition was employment-related, and recommended conservative treatment with splints and anti-inflammatories. He also recommended minimal use of the caulking gun for three weeks. Thereafter, plaintiff continued to work through her next evaluation with Dr. Westly on September 24, 1993 in a "floating job" in the wiring department where she went from worktable to worktable helping other employees with their wiring work, using needle-nose pliers and screwdrivers.
4. Plaintiff was re-evaluated by Dr. Westly on September 24, 1993, at which time she complained of continual tingling and aching during the day, mostly activity related. Dr. Westly performed a limited "in-office" electrodiagnostic evaluation which revealed abnormal motor nerve conduction in the median nerve across both carpal canals, more so on the right than on the left. His diagnosis remained the same as before. Based upon plaintiff's continued symptoms and the diagnostic findings, Dr. Westly prescribed a carpal canal injection and work restrictions of "no forceful (less than 5 lbs.), repetitious gripping, twisting, or pinching with the right hand." This restriction was to remain in effect until November 25, 1993; however, plaintiff was permanently restricted to a minimal amount of repetitious pinching, gripping and twisting with her right hand and her use of vibrating tools was also restricted. Following this visit, plaintiff returned to work and continued to work under the restrictions imposed by Dr. Westly.
5. Plaintiff's condition continued to slowly deteriorate in spite of being provided light duty work in the wiring department where she was required to utilize screwdrivers and needle nose pliers. Plaintiff's symptoms were aggravated by and became worse while doing the wiring job, which she reported to her supervisor.
6. On plaintiff's December 17, 1993, visit to Dr. Westly she reported an increase in her symptoms after having been placed on a job which required bundling and tying sections of electrical wire and the application of lock ties with a hand-held clamping device and the use of small snips. Dr. Westly noted new symptoms in the left hand of swelling and soreness in the thumb. Dr. Westly's diagnosis or assessment was volar compartment tenosynovitis and low grade carpal tunnel syndrome, right wrist. Based upon the deterioration of plaintiff's condition and the increase in her symptoms, Dr. Westly recommended that she remain on restricted or modified work activity on an indefinite basis. Plaintiff continued to receive conservative treatment from Dr. Westly; but in his May 2, 1994 note he felt that surgery was warranted. Plaintiff was not ready for surgical intervention at that time.
7. In November, 1994, Dr. Westly again recommended surgical intervention to release the median nerve. Plaintiff declined surgery and continued to work under the same, previously stated restrictions. Plaintiff later agreed to surgery and on February 2, 1995 she underwent a decompression/neurolysis of the median nerve of the right carpal canal in her wrist. Following surgery, Dr. Westly placed plaintiff on "no-work" status for two days and thereafter no work involving use of her right hand until March 19th. Dr. Westly changed his recommendation to "no work" until March 19, 1995 after being told that no one-handed work was available. Dr. Westly later restricted plaintiff to no work using the right hand until April 3, 1995. Dr. Westly also restricted plaintiff's use of her left hand at work to no repetitious gripping, pinching or twisting.
8. Upon plaintiff's return to work, a one-handed job was made available to her. She could ask for assistance whenever her work required activity she could not or should not perform, although she disliked asking for such assistance.
9. Plaintiff returned to her regular wiring job, full-time April 3, 1995 since there was no other work available that she could perform. By the end of the week she was doing other work that required forceful gripping and twisting with a wrench-type tool in a confined space. After resuming her regular job duties involving forceful gripping and twisting with her hands, plaintiff experienced increased soreness and sharp pain in her right wrist, extending throughout her right hand. Additionally, plaintiff began to experience poor sleep due to continuous and increasing hand pain. Plaintiff was unable to work forty hours per week on a regular basis.
10. On April 10, 1995, plaintiff returned to Dr. Westly. At that time she reported pain mostly on the lower radial aspect of the right wrist and palm, radiating up the radial aspect of the right forearm. Dr. Westly diagnosed an increased inflammation about the flexor compartment of the right wrist and the flexor carpi radialis sheath secondary to increased soft tissue strain. Based upon this examination and history, Dr. Westly made a recommendation that plaintiff not use her right hand for any forceful work activity greater than 5 lbs., and that she avoid gripping, pinching, or twisting with the right hand.
11. On May 22, 1995, plaintiff returned to Dr. Westly with complaints of persistent pain in both wrists and hands which was now radiating into both upper extremities. She reported that, despite his restrictions, she continued to do most of her regular work using a drill and other tools with her left hand and using a "torque driver" some of the time with her right hand. She also reported sleep difficulty several times a week due to soreness and aching in both upper extremities. At that time, Dr. Westly diagnosed plaintiff with a myofascial pain disorder and recommended that she be seen in consultation with Dr. Sean Maloney, whom Dr. Westly described as being an expert with respect to the origin and treatment of such disorders as myofascial pain syndrome. Dr. Westly further recommended that plaintiff continue to follow the prior work limitations of no forceful work activity (no forceful activity greater than 5 lbs.), and no gripping, pinching, or twisting with the right hand.
12. On May 31, 1995, plaintiff was seen by Dr. Sean Maloney, an expert in physical medicine and rehabilitation. Based upon his examination and the prior treatment history from Dr. Westly, Dr. Maloney diagnosed plaintiff as suffering from persistent, intermittent bilateral hand pain and numbness, myofascial pain/fibromyalgia involving the muscles of the neck, shoulders, back and hips, and increased anxiety and possible reactive depression associated with chronic upper extremity pain. An MRI scan revealed disk protrusions at C4-5, C5-6, and C6-7.
13. Plaintiff has remained primarily under Dr. Maloney's care since May 31, 1995 for treatment of her bilateral hand pain and myofascial pain/fibromyalgia. Dr. Maloney is of the opinion that plaintiff's carpal tunnel syndrome (or median nerve compression as diagnosed by Dr. Westly) and resulting surgery is one of three significant contributing factors in the development of her myofascial pain disorder. The other two are smoking and degenerative disc disease. In his opinion neither of the three could be designated as the "predominant" factor compared to the others. It is Dr. Maloney's opinion that plaintiff's carpal tunnel syndrome, myofascial pain disorder, and cervical spondylosis are inseparably intertwined and are all aggravated by repetitive activity and/or heavy lifting. Greater weight is accorded to the opinion of Dr. Maloney over that of Dr. Westly on whether plaintiff's myofascial pain disorder is causally related to her carpal tunnel syndrome. Dr. Westly deferred to the opinion of Dr. Maloney on whether plaintiff's myofacial pain disorder was work-related.
14. Defendant admitted liability for plaintiff's occupational disease of "bilateral carpal tunnel syndrome" on an Industrial Commission Form 60 dated November 3, 1995.
15. Plaintiff's carpal tunnel syndrome caused, or significantly contributed to the development of her myofascial pain syndrome/fibromyalgia.
16. As a direct result of her myofascial pain syndrome and her bilateral hand and wrist pain, plaintiff is limited to lifting, pushing and pulling no more than three-to-five pounds, no repetitive activity with her upper extremities, no reaching overhead, and working not more than five days per week, eight hours per day. Dr. Maloney gave plaintiff these restrictions on November 4, 1996 and continued these same restrictions in effect on January 3, 1997. Plaintiff has only been able to work an average of twenty-four to thirty hours a week since returning to work following her surgery on February 2, 1995. Her doctors instructed her to stay out of work when the pain she experiences becomes too great to tolerate. Since February 2, 1995 plaintiff has missed more than seven days from work due to her occupational diseases. Plaintiff's occupational diseases are disabling.
17. Due to concern regarding plaintiff's arm symptoms, Dr. Maloney referred plaintiff to Dr. Keith Maxwell, an expert in spine surgery for evaluation. After an MRI scan, Dr. Maxwell determined that plaintiff suffered from a little cervical spondylosis at C5-6 and C6-7.
18. After brief attempts to work in the stockroom and the receiving departments where plaintiff continued to experience pain in her right hand, wrist, arm and shoulder; plaintiff was placed in a temporary office position assisting other personnel with filing, sorting, and making copies on a copying machine. Defendant's Human Resources Manager, Irma Holland, testified that the filing work in the office and purchasing department made available to plaintiff beginning approximately May 7, 1996 was a job created specifically for the plaintiff in their effort to accommodate plaintiff's restrictions, and was not a job regularly available to other employees working for defendant-employer. However, there were permanent office positions for which plaintiff might be trained in the future.
19. Although plaintiff continues to earn wages in the job created for her by defendant, plaintiff's presumption of disability continues as defendant has offered no evidence that plaintiff is capable of earning her pre-injury wages in the same or any other employment, or that plaintiff is able to get a job in the competitive job market that would pay her comparable wages to those she is currently earning for the type of work she is doing. The job duties performed by plaintiff in the temporary office position do not accurately reflect plaintiff's ability to compete with others for wages in a similar position in the competitive job market.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. As a result of her employment duties with defendant-employer, plaintiff has contracted bilateral carpal tunnel syndrome, an occupational disease which is due to causes and conditions which are characteristic of and peculiar to her particular trade, occupation or employment, excluding all ordinary diseases of life to which the general public is equally exposed outside of her employment. Defendant has admitted liability for this claim on an I.C. Form 60. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's compensable carpal tunnel syndrome significantly contributed to the development of her myofascial pain disorder/fibromyalgia. Therefore, plaintiff is entitled to compensation for all treatment and disability resulting from her myofascial pain disorder/fibromyalgia.
3. A job which is specifically created for a plaintiff and is not generally available to other individuals in a competitive job market is "make work" and is not evidence of plaintiff's wage-earning capacity, nor does it qualify to rebut plaintiff's presumption of continuing disability. Peoples v. ConeMills, 316 N.C. 426, 342 S.E.2d 798 (1986). Likewise, a job which is so modified that it does not accurately reflect a plaintiff's ability to earn wages in the competitive job market does not rebut plaintiff's presumption of continuing disability.
4. As a result of the physical impairment and restrictions caused by plaintiff's compensable occupational disease, plaintiff has been incapable of earning the same or greater wages in a competitive job since February 2, 1995. Plaintiff is entitled to continuing disability compensation. Russell v. Lowes Prod.Distrib., 108 N.C. App. 762, 425 S.E.2d 454 (1993).
5. Plaintiff is entitled to compensation for temporary total disability at the rate of $213.83 per week from February 2, 1995 through the date of hearing before the deputy commissioner and continuing thereafter until further order of the Industrial Commission. Defendant is entitled to a credit for any workers' compensation paid to, or wages earned by plaintiff since February 2, 1995. N.C. Gen. Stat. § 97-29 and § 97-42.
6. Plaintiff is entitled to payment of all past and future medical expenses incurred or to be incurred as a result of her occupational diseases of carpal tunnel syndrome, myofascial pain disorder, and fibromyalgia for so long as such examinations, evaluations and treatments tend to effect a cure, give relief, or lessen her disability. N.C. Gen. Stat. § 97-25, and § 97-57.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Subject to the attorney's fee provided for below, for plaintiff's compensable development of occupational diseases, defendant shall pay the plaintiff temporary total disability compensation at the rate of $213.83 per week from February 2, 1995 through date of hearing before the deputy commissioner and thereafter continuing until further order of the Industrial Commission. Defendant is entitled to a credit for any workers' compensation paid to, or wages earned by plaintiff since February 2, 1995. Amounts of compensation which have accrued shall be paid in a lump sum.
2. Defendant shall pay all medical expenses incurred or to be incurred in the future by the plaintiff as a result of her occupational diseases for so long as such examinations, evaluations and treatments tend to effect a cure, give relief, or lessen the period of disability when the bills for same have been submitted and approved through the procedures adopted by the Industrial Commission.
3. A reasonable attorney's fee of twenty-five percent of the compensation awarded plaintiff herein is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the lump sum payment due plaintiff shall be deducted and paid directly to plaintiff's counsel; thereafter, plaintiff's counsel shall receive every fourth check.
4. Defendant shall pay all costs, including an expert witness fee of $155.00 to Dr. Sean Maloney.
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ LAURA K. MAVRETIC COMMISSIONER
DISSENTING:
S/_____________ RENEE C. RIGGSBEE COMMISSIONER